# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

SANDRA BROWN,

                Plaintiff,


v.                          **MEMORANDUM OF LAW & ORDER**
                              Civil File No. 06-3141 (MJD/AJB)

CITY OF GOLDEN VALLEY
and ROB ZARRETT, Golden
Valley Police Officer,

                Defendants.

_____

Paul Applebaum, Applebaum Law Office; Roger L. Kramer, Gislason & Hunter LLP; and Scott W. Swanson, Sjoberg & Tebelius, Counsel for Plaintiff.

Jason M. Hiveley, Jon K. Iverson, and Susan M. Tindal, Iverson Reuvers, LLC, Counsel for Defendants.

_____

## I.      INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary

Judgment.  [Docket No. 10]  The Court heard oral argument on February 1, 2008.

## II.      BACKGROUND

### A.      Factual Background

### 1.    Arrest and Tasering Incident

On October 8, 2005, Plaintiff Sandra Brown returned home from work at approximately 5 p.m.  (S. Brown Dep. 13.)  Plaintiff had one cocktail, vodka, and her husband, Richard Brown, had one cocktail, whiskey, at home.  (S. Brown Dep. 13-14, 16; R. Brown Dep. 9-10.)   They finished their drinks at the end of their driveway, so Plaintiff and her husband set the glasses on the floor of the passenger side of the car.  (S. Brown Dep. 45; R. Brown Dep. 9.)   Plaintiff and her husband then drove to a restaurant in downtown Minneapolis to have dinner with friends at approximately 6:30 p.m.  (S. Brown Dep. 13-14, 16; R. Brown Dep. 9-10.)  Both Sandra and Richard Brown consumed alcohol at the restaurant – Plaintiff had one cocktail – vodka –, a glass of wine, coffee, and water, while her husband had a couple of glasses of wine.  (S. Brown Dep. 14-16, 50; R. Brown Dep. 10.)  Plaintiff claims that she was not intoxicated.  (S. Brown Dep. 50.)

The Browns left the restaurant at approximately 12:30 a.m., with Richard Brown driving the car.  (S. Brown Dep. 16-17; R. Brown Dep. 10.)  While Richard Brown was driving on Highway 394, the Browns saw police lights behind them. (S. Brown Dep. 16-17; R. Brown Dep. 11-12.)  The Browns' vehicle was in the left lane and they thought that the lights were for someone else, so Richard Brown

2

moved the car into the right-hand lane to allow the police car to pass him.  (S. Brown Dep. 18; R. Brown Dep. 12.)  However, the police car pulled over to the right, too.  (R. Brown Dep. 13.)  Richard Brown slowed down his vehicle and looked for a place to pull over.  (Id.)  Large, orange barrel barricades prevented him from stopping on the right shoulder.  (S. Brown Dep. 18-19; R. Brown Dep. 13-14.)  Richard Brown then moved back into the left-hand land and, just before the Louisiana exit, he stopped the car.  (S. Brown Dep. 19; R. Brown Dep. 13-14.)

Richard Brown opened his car door and started to get out, but a police officer told him to get back in the car and close the door, which he did.  (S. Brown Dep. 20-21; R. Brown Dep. 14.)  Plaintiff and her husband sat silently in the car waiting for an officer to come to the car.  (R. Brown 16.)  Three officers approached the car.  (S. Brown Dep. 22; R. Brown Dep. 15.)  Officers approached the driver's side and asked Richard Brown if he knew why they had stopped him.  (S. Brown 22; R. Brown Dep. 15.)  He said he did not know.  (S. Brown Dep. 22; R. Brown 15.)  Richard Brown states that he did not yell at the officers and he was not asked to show identification or proof of insurance.  (R. Brown Dep. 15-16.)  St. Louis Park police officers opened the driver's door and forcefully pulled Richard Brown out, threw him up against the side of the car, handcuffed him,

3

and threw him into the back seat of the squad car.  (S. Brown Dep. 22; R. Brown Dep. 15-16.)

Officer Rob Zarrett, of the Golden Valley police force, was monitoring radio traffic and heard that St. Louis Park police had been following a vehicle on 394 that was not stopping and then heard that the car had finally pulled it over. (Zarrett Dep. 29, 36-38.)  He next heard that the driver had gotten out of the car and refused to get back in.  (Id. 36-37.)  A second and third squad had arrived, one from St. Louis Park and one from Golden Valley, so Zarrett was the fourth officer to arrive.  (Id. 38.)  At that point, Richard Brown was already in custody and being led to the squad car by a couple of officers.  (Id. 40.)

Plaintiff became "scared to death" because of the officers' rage and called 911.  (S. Brown Dep. 23-24.)  While on the phone, Plaintiff heard officers yell, "She is on 9-1-1.  She is on 9-1-1."  (Id. 26.)  The 911 operator tried to calm Plaintiff down and assure her that the police would not harm her.  (Id. 27.) Zarrett claims that he did not know that Plaintiff was on the telephone with 911 until after she was in the squad car.  (Zarrett Dep. 63-65.)

Zarrett and a St. Louis Park officer, Officer Forester, went to the driver's side of the car to see if there were other occupants.  (Zarrett Dep. 40-41.)  The

4

officers saw Plaintiff on the phone, and Forester told Plaintiff to hang up the cell phone.  (Id. 41)  According to Zarrett, Plaintiff said that she would not hang up and she turned away.  (Id.)

At that time, Forester pointed out to Zarrett that there were two liquor glasses or tumblers at Plaintiff's feet.  (Zarrett Dep. 44.)  Zarrett could see brown liquid in the tumblers.  (Id.)  Zarrett was concerned that the two glass tumblers at Plaintiff's feet contained alcohol and could be used as weapons.  (Id. 44, 48.)  Zarrett was also concerned that Plaintiff might attempt to destroy evidence  (Id. 44.)  He also thought that Plaintiff was intoxicated because there appeared to be liquor in the tumblers, Plaintiff appeared disheveled, her eyes were watery and bloodshot, and she was ignoring police commands.  (Id. 46, 61-62.)  Zarrett suggested to Forester that they remove Plaintiff from the vehicle and put her in a squad car, so Zarrett approached the passenger side of the car.  (Id. 45.)

Zarrett asserts that he then opened the passenger door and told Plaintiff to hang up her phone, but Plaintiff said "no," and returned to a forward facing position.  (Zarrett Dep. 46.)  According to Plaintiff, Zarrett yelled at Plaintiff to "get off the phone."  (S. Brown Dep. 26-27.)  According to Plaintiff, she told Zarrett that she was "very frightened" and "want[ed] to stay on the phone with

the operator." (S. Brown Dep. 27.)  Plaintiff admits that Zarrett twice asked her to

get off of the phone.  (S. Brown Dep. 49.)  Zarrett also claims that he repeatedly

ordered her to remove her seatbelt.  (Zarrett Dep. 56.)  Zarrett claims Plaintiff

scooted herself away from the officers and drew her knees up towards her chest,

as if she might be getting ready to kick.  (Id. 46, 50.)  According to Zarrett, he

showed Plaintiff his intent to use the taser by removing the air cartridge from the

taser and activating it, so that both the flashlight and the laser on the taser

activated.  (Id. 47, 89.)

The operator told Plaintiff that the police would not harm her.  (S. Brown

Dep. 27.)  Zarrett again asked Plaintiff to get off of the phone and she refused,

saying, "I am frightened."  (S. Brown Dep. 27.)  At one point, the operator asked

if he could speak with the police.  (Id. 29.)  According to Plaintiff, the next

moment, Zarrett tasered her.  (Id. 27, 29.)  Zarrett applied the drive stun of his

taser to Plaintiff's upper arm.  (Zarrett Dep. 49.)  The air cartridge to the taser

contains the darts, and Zarrett had removed the cartridge, so no darts were used

in this incident.  (Id. 50-51.)  Plaintiff received a two-to-three second taser cycle.

(Id. 52.)

According to Plaintiff, after Zarrett tasered her, he reached in and grabbed

her cell phone from her, as well as some of her hair, and threw it across the car, out of the driver's door, and onto the pavement.  (S. Brown Dep. 28-29.)  Zarrett claims that he took the cell phone from her and tossed it onto the driver's seat before he tasered her.  (Zarrett Dep. 49.)

According to Plaintiff, Zarrett did not tell her to get out of her vehicle or remove her seatbelt; nor did he tell her that she would be tasered if she did not remove her seatbelt and get out of the vehicle.  (S. Brown Dep. 30, 48.)  Zarrett admits that he gave no verbal warning to Plaintiff that she would be tasered if she did not comply with officer commands.  (Zarrett Dep. 56-57, 89.)

According to Zarrett, after being tasered, Plaintiff complied and removed her seatbelt, although officers had to remove her from the car.  (Zarrett Dep. 52.)

According to Plaintiff, Zarrett forcibly removed her from the vehicle, with her wrists bent and her arms behind her back.  (S. Brown Dep. 32-33.)  He put her in a hammer lock, dragged her to the squad car, handcuffed her, and put her into the squad car.  (Id. 33-35.)  According to Zarrett, he held onto her right arm to remove her from the vehicle and used a wrist lock on her on the way to the squad car.  (Zarrett Dep. 53, 55.)  Zarrett asserts that, while being escorted, Plaintiff braced her feet and clenched her fists, trying to bring them to her front.  (Id. 55.)

Zarrett claims he repeatedly told Plaintiff to stop resisting, while Plaintiff states he only once told her to stop resisting.  (Zarrett Dep. 57; S. Brown Dep. 34.)  At the squad car, Plaintiff was handcuffed and patted down before being placed into the squad.  (Zarrett Dep. 61.)  Zarrett transported Plaintiff to the Golden Valley police station.  (Zarrett Dep. 65.)

According to Plaintiff, at no time during her encounter with the officers on 394, was she ever asked about drinking glasses on the floor of her car.  (S. Brown Dep. 36, 43.)  Plaintiff asserts that she thought that there was nothing in the glasses.  (Id. 43.)  Plaintiff asserts that she later learned from the St. Louis Park police that one glass was empty and the other had a slight amount of liquid with a minimal amount of alcohol in it.  (Id. 44-45.)

At the Golden Valley police station, Zarrett cited Plaintiff with obstruction and an open bottle violation.  (Zarrett Dep. 84.)  In connection with an agreement with prosecutors to suspend prosecution, Plaintiff agreed that, if prosecution resumed, she stipulated to the presence of open liquor containers in the car.  She also paid a $300 fine.  (S. Brown Dep. 44-47; Ex. 1 to Tindal Aff.)

Richard Brown took two breathalyzer tests at the St. Louis Park police station.  (R. Brown Dep. 22.)  He was charged with and pled guilty to speeding.

8

(Id. 21-22.)  After he was released from the St. Louis Park police station, Richard

Brown went to get Plaintiff at the Golden Valley police station.  (Id. 22-23.)  At

the Golden Valley police station, a Golden Valley police officer took a photo of

Plaintiff's bruises.  (Id. 23.)  Plaintiff was then released, and she and her husband

took a cab home.  (Id.)

### 2.    Injuries

Plaintiff suffered bruised wrists and arms and red welts or marks where

she was tasered.  (S. Brown Dep. 51; R. Brown Dep 28-29.)  She also asserts that

she suffered extreme pain while being tasered.  (S. Brown Dep. 30-31.)  She felt a

very sharp pain that radiated out from where she was tasered that felt like pins

and needles.  (Id. 67-68.)  Her muscles also clenched up.  (Id. 68.)

Plaintiff also claims that she suffered mental pain. (S. Brown Dep. 51.)  On

the Monday after the arrest, Plaintiff went to her primary care physician and was

prescribed anti-anxiety medication.  (Id. 52.)  She had never before been

diagnosed with an anxiety disorder or with depression.  (Id. 54.)  Plaintiff asserts

that when she sees a police officer, her heart rate increases, a rash sometimes

breaks out, she sometimes hyperventilates, and she remains frightened of the

police.  (Id. 51-52; R. Brown Dep. 25-26, 31.)  For six or seven months after the

incident, she had trouble sleeping, often waking up with the incident first thing

on her mind.  (S. Brown Dep. 54-55.)  Plaintiff had difficulty focusing at work for

a few weeks after the incident.  (Id. 55.)

Plaintiff saw a psychologist about a month after the incident because the

memories of being tasered kept popping into her mind.  (S. Brown Dep. 56-58.)

She saw the psychologist again a few weeks later.  (Id.)

### 3.     Taser and Taser Training

Zarrett used the X26 model taser, which used 50,000 volts.  (Zarrett Dep.

14.)  A taser can be operated in two modes: the drive stun mode, without an air

cartridge at the end of the taser, so that the taser has direct contact with the

suspect or in another mode in which the darts are fired from the cartridge and

the darts come in contact with the suspect.  (Id. 18.)  The air cartridge to the taser

contains the darts.  Because Zarrett removed the air cartridge before tasering

Plaintiff, no darts were used.  (Zarrett Dep. 50-51.)

The Golden Valley police force began using tasers sometime in 2005.

(Zarrett Dep. 12.)  Before the incident on October 8, 2005, Zarrett had attended a

two-day course on the use of tasers at Taser Instructor School and became

certified to instruct officers in the use of tasers.  (Id. 12-13.)  He then trained other

Golden Valley police officers on the use of tasers.  (Id. 13.)

In his career as a Golden Valley police officer, Zarrett used a taser fewer than ten times.  (Zarrett Dep. 14, 80.)  Zarrett has also experienced a full taser cycle himself through darts in his back.  (Id. 15.)  A full Taser cycle is five seconds if contact is maintained with the individual for five seconds.  (Id. 50.)

Zarrett extracts persons from vehicles about five times a year.  (Zarrett Dep. 94-95.)  He has been a police officer for eleven years.  (Id.)

### B.    Procedural Background

On July 6, 2006, Brown commenced this action against the City and Zarrett in Minnesota state court, Hennepin County.  In her Complaint, Brown alleges Count One: Civil Rights Violations by Defendant Zarrett, claiming violation of Brown's right to be free from "the use of excessive and unreasonable force, the deprivation of liberty without due process of law, unlawful seizure of the person, and summary punishment;" Count Two: Civil Rights Violations by Defendant City of Golden Valley; Count Three: Assault and Battery; Count Four: Intentional Infliction of Emotional Distress; Count Five: False Imprisonment; Count Six: Use of Excessive Force; and Count Seven: Negligence.

In her opposition brief, Plaintiff has agreed to drop her claims against the

City, her claims for intentional infliction of emotional distress, negligent failure to train, negligent failure to supervise, and false imprisonment.  (Pl.'s Mem. at 13 n.1)

On July 28, 2006, Defendants removed the matter to this Court based on federal question jurisdiction.  Defendants now move for summary judgment on all claims against them.

## III.   DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

 "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law.  But if there is a genuine

dispute concerning predicate facts material to the qualified immunity issue, there

can be no summary judgment." Greiner v. City of Champlin, 27 F.3d 1346, 1352

(8th Cir. 1994) (citations omitted).

### B.    Uncontested Claims

In her opposition brief, Plaintiff has agreed to drop her claims against the

City, her claims for intentional infliction of emotional distress, negligent failure to

train, negligent failure to supervise, and false imprisonment.  (Pl.'s Mem. at 13

n.1)  Additionally, Plaintiff's brief and presentation at oral argument confirms

that Plaintiff is not seeking trial on a claim for false arrest.  The only remaining

claims before the Court are 1) a § 1983 claim based on excessive force and 2) a

state law assault and battery claim, both against Defendant Zarrett only.

Therefore, the Court grants summary judgment to Defendants on the remaining

claims and dismisses the City as a Defendant.

### C.    § 1983 Claim

#### 1.    Qualified Immunity Standard

When bringing a § 1983 claim a plaintiff must establish (1) that he was

deprived of a right secured by the Constitution or laws of the United States and

(2) that the deprivation was committed under color of state law.  Lugar v.

Edmondson Oil Co., 457 U.S. 922, 931 (1982).  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation omitted).  Brown asserts that Zarrett violated her federal constitutional rights through use of excessive force during her arrest, particularly through use of the taser.

Zarrett argues that qualified immunity shields him from liability.  "The purpose of qualified immunity is to allow public officers to carry out their duties as they believe are correct and consistent with good public policy, rather than acting out of fear for their own personal financial well being."  Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002) (citation omitted).  "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known."  Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006) (citations omitted).

The Court performs a two-step inquiry to determine whether Zarrett is entitled to qualified immunity:

(1) whether, after viewing the facts in the light most favorable to the

party asserting the injury, there was a deprivation of a constitutional
or statutory right; and, if so, (2) whether the right was clearly
established at the time of the deprivation such that a reasonable
official would understand his conduct was unlawful in the situation
he confronted.

Henderson, 439 F.3d at 501-02 (citations omitted).

### 2.    Excessive Force Claim

#### a.    Standard for Excessive Force

Generally, the Fourth Amendment protection against unreasonable

seizures of the person provides a clearly established right to be free from

excessive force during arrest.  Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998).

When determining whether a law enforcement officer used excessive force in the

course of an arrest, "[t]he question is whether the officers' actions are objectively

reasonable in light of the facts and circumstances confronting them, without

regard to their underlying intent or motivation."  Winters v. Adams, 254 F.3d

758, 765 (8th Cir. 2001) (citation omitted).  "[T]he reasonableness of the officer's

belief as to the appropriate level of force should be judged from that on-scene

perspective."  Saucier v. Katz, 533 U.S. 194, 205 (2001) (citation omitted).

"Circumstances such as the severity of the crime, whether the suspect posed a

threat to the safety of the officers or others, and whether the suspect was resisting

arrest are all relevant to the reasonableness of the officer's conduct." Henderson, 439 F.3d at 502 (citation omitted).

### b.      Whether a Fourth Amendment Violation Occurred

### i.      Whether Zarrett's Actions Were Reasonable

Zarrett asserts that his use of the taser was reasonable. He argues that from his point of view at the time of the incident, he knew Plaintiff's vehicle had failed to stop for officers and Richard Brown had not complied with officer commands. He notes that fleeing from an officer in a motor vehicle is a felony. Plaintiff admits she did not comply with his commands to get off of the telephone. Zarrett believed Plaintiff was intoxicated because he smelled alcohol and there were two glasses appearing to contain alcohol at Plaintiff's feet. He believed that Plaintiff threatened officer safety by scooting herself away from the officers, drawing her knees towards her chest, and acting as if she were going to kick them. Zarrett was also concerned about getting Plaintiff away from the glasses to prevent her from destroying evidence or using them as a weapon.

Zarrett asserts that he warned Plaintiff before tasering her, but asserts that even if, as Plaintiff asserts, he did not warn her, he is entitled to qualified immunity. Zarrett points to a District of Colorado case in which the court held

16

that an officer did not use excessive force tasering the plaintiff without warning

because the actions were reasonable when the plaintiff attempted to leave the

courthouse with a court file despite multiple attempts to stop him.  However, this

case is not helpful to Zarrett's argument because it was recently reversed by the

Tenth Circuit Court of Appeals.  See Casey v. City of Fed. Heights, Civil Case No.

05-cv-01013-REB-PAC, 2006 WL 2711760 (D. Colo. Sept. 21, 2006) (unpublished),

rev'd 509 F.3d 1278 (10th Cir. 2007).  In Casey, the plaintiff went to a courthouse

to contest his traffic ticket, and, when he lost, "he walked to the parking lot to

retrieve money from his truck to pay the fine, carrying with him the court file.

On his way back to the courthouse he was grabbed, tackled, Tasered, and beaten

by city police officers."  509 F.3d at 1279.  First, one officer tackled the plaintiff,

and then a second officer arrived at the scene while the plaintiff and the first

officer were struggling, and the second officer tasered the plaintiff.  Id. at 1280.

The Tenth Circuit held that the second officer did use excessive force in tasering

the plaintiff and was not entitled to qualified immunity.  Id. at 1286.  The court

reasoned that the plaintiff's conduct of removing a record from the courthouse

was only a nonviolent misdemeanor.  Plaintiff committed the offense in a

particularly innocuous way because he only took the file to the court parking lot

17

and was attempting to bring it back.  Id.  The second officer tasered the plaintiff

although the alleged crime was minor, plaintiff was not fighting back against the

first officer or fleeing, the second officer had just arrived at the scene, and the

second officer gave the plaintiff no warning that she was going to taser him.  Id.

at 1285.  The court concluded that the second officer violated a clearly established

right because there was no circuit opinion upholding "the use of a Taser

immediately and without warning against a misdemeanant."  Id. at 1286.

Taking the evidence in the light most favorable to Plaintiff, Zarrett did not

warn her before tasering her.  Cf. Schumacher v. Halverson, 467 F. Supp. 2d 939,

944, 951 (D. Minn. 2006) (upholding single use taser on intoxicated motorist after

police warned him three times that he would use taser if plaintiff failed to

comply).  Plaintiff was not holding dangerous weapons or threatening Zarrett.

Cf. Russo v. City of Cincinnati, 953 F.2d 1036, 1044-45 (6th Cir. 1992) (upholding

use of taser when officers faced patient who was potentially homicidal and

suicidal, had made threatening statements, refused to return to psychiatric

institute, and was armed with knives).

Here, viewing the facts in the light most favorable to Plaintiff, Plaintiff

gave no indication of violence and made no attempt to flee; Zarrett did not warn

18

her that he would use the taser or attempt to use any other type of force; and

Zarrett was one of **four** officers on the scene and Plaintiff's husband was already

safely in the squad car.  The only crime Zarrett suspected Plaintiff of committing

was a violation of the open container statute - a minor crime, particularly since

Plaintiff was the passenger in the car.  Although there were tumblers at Plaintiff's

feet, any object could be used as a weapon and there is no allegation that Plaintiff

made any indication to reach for the tumblers, dispose of the tumblers, or use

them as a weapon.

Zarrett did not order Plaintiff to get out of the car or remove her seatbelt.

He only told Plaintiff to hang up the telephone.  Accepting Plaintiff's version of

the facts, Zarrett knew that she was on the telephone with a 9-1-1 operator and

was frightened, yet after the second time she failed to heed his command to get

off of the telephone, without warning, he tasered her.  Cf. Parker v. City of S.

Portland, No. 06-129-P-S, 2007 WL 1468658, at *21-*23 (D. Me. May 18, 2007)

(unpublished) (gathering cases in which district courts held use of taser was not

entitled to qualified immunity and holding that use of taser on unarmed,

intoxicated motorist, who did not physically threaten officers or attempt to flee

and who was surrounded by three officers, was not entitled to qualified

immunity), <u>aff'd</u> 2007 WL 2071815 (D. Me. Jul 18, 2007) (unpublished).

The Court concludes, that viewing the evidence in the light most favorable to Plaintiff, Zarrett's actions were unreasonable.

### ii.    Extent of Brown's Injuries

Zarrett claims that Brown's injuries are too minor to support a claim for excessive force.  A plaintiff must demonstrate "actual injury" to support a claim for excessive force.  <u>Hanig v. Lee</u>, 415 F.3d 822, 824 (8th Cir. 2005).  Mere allegations of pain as a result of being handcuffed, including bleeding, without any allegation of long-term injuries, are not sufficient injuries to support a claim for excessive force.  <u>Crumley v. City of St. Paul, Minn.</u>, 324 F.3d 1003, 1008 (8th Cir. 2003).

Plaintiff asserts that she suffered extreme pain at the time of the tasering, bruising, marks where she was tasered, and emotional pain.  The Eighth Circuit has specifically held that following examples constitute "actual injury:" 1) "bruises and a facial laceration," 2) "bruised knees and elevated blood pressure," 3) "posttraumatic stress disorder," or 4) a "single small cut of the lateral right eyelid and small scrapes of the right posterior knee and upper calf."  <u>Lambert v. City of Dumas</u>, 187 F.3d 931, 936 (8th Cir. 1999) (citations omitted).  Based on this

20

minimal injury requirement, the Court holds that Plaintiff has offered sufficient evidence of injury to survive summary judgment.

### c.      Whether Brown's Right Was Clearly Established

"[T]he right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." <u>Henderson v. Munn</u>, 439 F.3d 497, 503 (8th Cir. 2006) (citations omitted).  Thus, the Court "must determine if genuine issues of material fact exist as to whether a reasonable official would understand his conduct violated that right in the situation he confronted." <u>Id.</u>  Zarrett "must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." <u>Id.</u> (citation omitted).

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

<u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (citations omitted).  And qualified immunity will protect an officer who violates a suspect's constitutional rights if

the officer "reasonably misapprehends the law governing the circumstances []he

confronted." Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

The Eighth Circuit has not specifically addressed the constitutionality of

taser use in a case factually analogous to this case. Cf. Hickey v. Reeder, 12 F.3d

754, 757-59 (8th Cir.1993) (holding officers violated Eighth Amendment by using

stun gun on inmate to force him to sweep his cell when officers did not feel

threatened by inmate); Duncan v. Storie, 869 F.2d 1100, 1103 (8th Cir. 1989)

(holding no qualified immunity when plaintiff alleged "he was savagely beaten

and that the officers tortured him with repeated applications of a stun gun").

However, the lack of an Eighth Circuit case addressing these specific facts

involving a taser does not mean that Zarrett did not violate clearly established

law. See Casey, 509 F.3d 1278, 1286 (10th Cir. 2007) (holding officer violated

clearly established right by using taser when court did "not know of any circuit

that has upheld the use of a Taser immediately and without warning against a

misdemeanant"). "[O]fficials can still be on notice that their conduct violates

established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S.

730, 741 (2002). "[T]here need not be a case with 'materially' or 'fundamentally'

similar facts in order for a reasonable person to know that his or her conduct

would violate the Constitution.  The 'salient question . . . is whether the state of the law' gave the officials 'fair warning that their alleged [conduct] was unconstitutional.'"  Young v. Selk, 508 F.3d 868, 875 (8th Cir. 2007) (quoting Hope, 536 U.S. at 741).

The Court notes that, under Plaintiff's version of the facts, Zarrett never even asked her to take off her seatbelt or get out the car.  He simply tasered her, without warning, for failure to end her 9-1-1 call.  At the time of this incident, it was clearly established that it was unreasonable to, without warning, taser a nonviolent passenger who was not fleeing or resisting arrest and was suspected of a minor, nonviolent crime, because she had disobeyed two orders to get off of the telephone with a 9-1-1 operator.  Cf. Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998) (holding officers who were attempting to arrest son were not entitled to qualified immunity when father, who had injured shoulder, told officers to leave his property, officers "grabbed [father's] wrist, pushed him backwards, and held him up against the open door inside the house"); Parker v. City of S. Portland, No. 06-129-P-S, 2007 WL 1468658, at *22 (D. Me. May 18, 2007) (unpublished) (holding that "as of July 20, 2005, it was clearly established that, in the scenario [the plaintiff] posits (that of an unarmed arrestee who is (i) suspected of having

23

committed a minor crime, (ii) not actively resisting arrest, (iii) not trying to flee and (iv) not posing an imminent threat of harm to officers or others), the use of a significantly violent level of force was unlawful.") (footnote omitted).  Plaintiff cannot have provoked Zarrett, made the use of force necessary, or resisted arrest when Zarrett did not tell her she was under arrest, tell her to remove her seatbelt or get out of the car, warn her that she would be tasered, or view any belligerent, threatening, or erratic behavior by Plaintiff.

### D.   State Tort Claims

Brown asserts state law claims of assault and battery against Zarrett.

### 1.   Assault and Battery

Assault is: "(1) [a]n act done with the intent to cause fear in another of immediate bodily harm or death; or (2) [t]he intentional infliction of or attempt to inflict bodily harm upon another."  Minn. Stat. § 609.02, subd. 10.  Battery is "an intentional unpermitted offensive contact with another."  Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980) (citations omitted).  Police officers are authorized to use reasonable force when effectuating an arrest.  Minn. Stat. §609.06.  "[T]he unreasonableness of the force used is an element of the action and the burden of proving such unreasonableness is on plaintiff."  Johnson v.

24

Peterson, 358 N.W.2d 484, 485 (Minn. Ct. App. 1984).  Thus, to succeed on her

claims against Zarrett, Brown must establish that he used an unreasonable

amount of force against her.

### 2.   Official Immunity

Zarrett claims that he is shielded from liability for the state law claims by

official immunity.  Under Minnesota's official immunity doctrine "a public

official charged by law with duties which call for the exercise of his judgment or

discretion is not personally liable to an individual for damages unless he is guilty

of a willful or malicious wrong."  Elwood v. Rice County, 423 N.W.2d 671, 677

(Minn. 1988) (citations omitted).  The Court uses a two-step inquiry to determine

whether official immunity is available to an officer: "(1) whether the alleged acts

are discretionary or ministerial; and (2) whether the alleged acts . . . were

malicious or willful."  Dokman v. County of Hennepin, 637 N.W.2d 286, 296

(Minn. Ct. App. 2001) (citation omitted).

All parties agree that Zarrett's actions were discretionary.  Thus, the Court

must determine whether the alleged actions were malicious or willful.  "Malice

means nothing more than the intentional doing of a wrongful act without legal

justification or excuse, or, otherwise stated, the willful violation of a known

right." <u>Rico v. State</u>, 472 N.W.2d 100, 107 (Minn. 1991) (citations omitted).

Zarrett argues that Plaintiff has submitted no evidence to show that his actions were malicious and does not even allege maliciousness in her memorandum.  Plaintiff argues that it is an open question whether a reasonable officer, faced with the facts and circumstances that existed on October 8, 2005, would have known that the need for and degree of force used against Plaintiff was unnecessary.

For the same reasons that the Court concludes that Zarrett is not entitled to summary judgment on qualified immunity grounds, the Court concludes that he is not entitled to official immunity on the assault and battery claims.  <u>See</u> <u>Gasparre v. City of St. Paul</u>, 501 N.W.2d 683, 687 (Minn. Ct. App. 1993) ("Because we conclude that there is a genuine issue of material fact as to whether any reasonably competent police officer would have concluded that [the police officer's] actions were legal, we conclude that there is a genuine issue of fact as to whether [the officer] acted maliciously.") (citation omitted).

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

 Defendants' Motion for Summary Judgment [Docket No. 10] is

**GRANTED IN PART** and **DENIED IN PART**  as follows:

1.     All claims against Defendant City of Golden Valley are **DISMISSED WITH PREJUDICE**.

2.     Count One: Civil Rights Violations by Defendant Zarrett **REMAINS** with respect to Plaintiff's excessive force claim.  Count One is **DISMISSED** to the extent it is based on false arrest.

3.     Count Two: Civil Rights Violations by Defendant City of Golden Valley; Count Four: Intentional Infliction of Emotional Distress; Count Five: False Imprisonment; and Count Seven: Negligence are **DISMISSED**.

4.     Count Three: Assault and Battery and Count Six: Use of Excessive Force **REMAIN** against Defendant Zarrett and are **DISMISSED** as to Defendant City of Golden Valley.

Dated: February 14, 2008                    s / Michael J. Davis
                                            Judge Michael J. Davis
                                            United States District Court